Pages 1 - 33

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable William H. Alsup, Judge

| | |
|---|---|
| FLUIDIGM CORPORATION, a<br>Delaware corporation; and<br>FLUIDIGM CANADA INC., a foreign<br>corporation, | )<br>)<br>)<br>) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| VS. | )   NO. C 19-5639 |
| | ) |
| IONPATH, INC., a Delaware<br>corporation, | )<br>) |
| | ) |
| Defendant. | ) |
| _____ | ) |

San Francisco, California
Thursday, January 23, 2020

**TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES**:

For Plaintiffs:

        BRYAN CAVE LLP
        Three Embarcadero Center - 7th Floor
        San Francisco, California  94111
    BY: **K. LEE MARSHALL, ESQ.**
        **ABIGAIL GORDON, ESQ.**

For Defendant:

        WILMER, CUTLER, PICKERING, HALE
         & DORR LLP
        950 Page Mill Road
        Palo Alto, California  94304
    BY: **SONAL N. MEHTA, ESQ.**


Reported By:  Ruth Levine Ekhaus, RDR, FCRR
            Official Reporter, CSR No. 12219

**(APPEARANCES CONTINUED ON FOLLOWING PAGE)**

1    **APPEARANCES**:   (CONTINUED)

2    For Defendant:

3                         WILMER, CUTLER, PICKERING, HALE
                            & DORR LLP

4                         One Front Street - Suite 3500
                         San Francisco, California 94111

5                    BY:  **JOSEPH TAYLOR GOOCH, ESQ.**
                         **JOSHUA FURMAN, ESQ.**

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

<u>**Thursday - January 23, 2020**</u>                         <u>**9:03 a.m.**</u>

                    P R O C E E D I N G S

                        ---o0o---

    **THE CLERK:**  Calling Civil Action 19-5639.  Fluidigm
Corporation, et al., versus IONpath, Incorporated.

    Would counsel step forward and state your appearances for
the record.

    **MR. MARSHALL:**  Lee Marshall and Abigail Gordon for
Fluidigm Corporation.

    **MS. MEHTA:**  Good morning, Your Honor.

    Sonal Mehta, Taylor Gooch, and Josh Furman on behalf of
IONpath.  And we have the CEO and co-founder of IONpath,
Dr. Harris Feinberg, here as well.

    **THE COURT:**  Where is he?

    **MS. MEHTA:**  He is right back there.

    **AUDIENCE:**  I'm here, Your Honor.

    **THE COURT:**  Welcome to the court.

    All right.  I can't go through every single argument you
have made.  It's just too much.  So tell me the most important
point you want me to have in mind.

    **MS. MEHTA:**  Yes, Your Honor.  I have three points, but
I'll start with one, and then we'll see --

    **THE COURT:**  You only get one.

    **MS. MEHTA:**  Okay.

    **THE COURT:**  Maybe I will give you two, if you're good.

**PROCEEDINGS**

1          **MS. MEHTA:**  Okay.  Thank you, your Honor.

2          **THE COURT:**  I can't handle three.  I got a -- I got

3     briefs.

4          **MS. MEHTA:**  I understand, Your Honor.

5          **THE COURT:**  Okay.  Tell me the most -- the thing that

6     in your experience the poor judge is likely to overlook, and

7     you want to make sure that I'm up-to-speed on.

8          All right.  I want to hear it.

9          **MS. MEHTA:**  Yes, Your Honor.  The key point I would

10    ask Your Honor to consider is the intentional interference with

11    contract claim and the fundamental failure to allege two

12    critical elements of that, which are specific contracts and any

13    breach of the contract themselves.

14         In paragraphs 90 to 96 of the pleading, where they

15    actually lay out their claim for intentional interference of

16    contract, there is a lot of suggestions about supposed or

17    alleged encouragement of breach, but there is no contract

18    actually identified, and there is no allegation of any breach.

19         And even in the briefing, even in their opposition to a

20    motion to dismiss, they have not been able to identify any

21    specific contract or any breach.

22         The best they have been able to come up with is the

23    suggestion that they have these terms and conditions with this

24    category of entities, which include governments, academic

25    institutions, and other private entities -- which means anybody

**PROCEEDINGS**

1   in the world, in a category of contracts with any possible

2   customer.  And then no allegation that there has actually been

3   any breach of any of those terms and conditions as to any of

4   those potential customers, let alone any act by IONpath that

5   caused the breach.

6        That fundamental failing means there is no breach of

7   contract and there is no intentional interference.

8        **THE COURT:**  All right.  You said that very succinctly.

9   I'm giving you an A-plus.

10        **MS. MEHTA:**  Thank you, Your Honor.

11        **THE COURT:**  I understand your argument completely.

12   And unlike many lawyers, you avoided blather; you got right to

13   the point.  That was excellent.  Well done.

14        All right.  I just want to -- on this one point, I'm on

15   a -- right now, I'm this close to granting this motion, so you

16   need to explain to me why, Counsel -- no blather.  Come right

17   to the point.  She says you never identified the contract, you

18   never identified the breach, and now you're trying to blame

19   them.  Go ahead.

20        **MR. MARSHALL:**  On paragraph 69, we identified the

21   contract.  It is the sales and license terms and conditions.

22        Paragraph 70, we identify the specific provision of the

23   contract that we allege was breached and that they induced the

24   breach of.  It is the provision that Fluidigm's customers

25   agreed not to, quote, use --

```
1              THE COURT:  I'm sorry.  Let me get the Complaint here.

2    My law clerks never give me the Complaint -- or, I'm wrong.

3    This time they did.

4         All right.  What is the --

5              MR. MARSHALL:  I'm on paragraph 69 and 70.  This is

6    page 19 of the Complaint.

7              THE COURT:  Okay, 69.  Paragraph 69.  I'm going to

8    read it myself.  (reading):

9                  "On or about February 7, 2018, Fluidigm" --

10        How do you say that name?

11             MR. MARSHALL:  Fluidigm.

12             THE COURT:  (reading):

13             "Fluidigm put IONpath on notice that by inducing and

14        seeking to convince customers to use the Maxpar antibodies

15        and related reagents with IONPath's technology, IONpath

16        was causing customers to breach the sales and license

17        terms and conditions, T and Cs, each customer agreed to

18        when using Fluid"--

19        That doesn't identify any specific contract.  Why didn't

20   you say something like, "The sales and license agreement we had

21   with the XYZ hospital in Omaha, Nebraska, dated XYZ?"

22        Why didn't you say that?

23             MR. MARSHALL:  Well, Your Honor, we don't know all of

24   their customers, but we do allege a specific customer and a

25   specific breach that we do know of, and that's down in
```

**PROCEEDINGS**

1  paragraph 73 where we say that the cell paper that's referred

2  to in paragraph 72 admits that IONpath knew that it and its

3  founders, who were at Stanford University -- and that's

4  described back on paragraph 64 -- breached the Ts and Cs.

5       It also --

6            **THE COURT:**  I'm sorry, my paragraph 73 doesn't say

7  that.  What paragraph did you mention again?

8            **MR. MARSHALL:**  73, (reading):

9            "Not only did the paper admit that IONpath knew that

10       it and its founders" --

11       Its founders are referenced earlier in the Complaint as

12  Dr. Bendall and Dr. Nolan, both of whom are described as being

13  at Stanford University -- that they breached the Ts and Cs.

14       So what's happening is that IONpath has an instrument

15  called the MIBIscope.  Fluidigm also has an instrument.  And

16  what IONpath is doing is directing their -- the people who own

17  a MIBIscope, an IONpath instrument, to go buy Fluidigm's

18  reagents and use it on their instrument.

19       And that's an express breach of Section 3.2 of the Ts and

20  Cs, which were described in paragraph 70.  And we put them on

21  notice of that issue.

22       The notice is described in paragraph 69, so they knew of

23  the Complaint.  They knew of the specific provision of the

24  Complaint that we believe that they were inducing customers to

25  breach --

PROCEEDINGS

1          THE COURT:  All right.

2          MR. MARSHALL:  -- and then --

3          THE COURT:  Wait.  What do you say to that?

4          MS. MEHTA:  Yes, Your Honor.  I have two responses.

5          THE COURT:  Just give me one.  Just one at a time.

6          MS. MEHTA:  The first is that the allegation in

7     paragraph 73 is not -- even if you accept everything he is

8     saying, is not an allegation that IONpath, which is the company

9     that is the defendant in this case, induced anyone to breach

10    any particular contract.

11         At best, it's an allegation that two professors at

12    Stanford, who also happen to be co-founders of IONpath, are

13    alleged to have breached a contract.

14         There is no suggestion of any activity by IONpath that

15    would induce that breach, even if you accept what he's saying.

16         The second point, if you'll permit me, is that when you

17    look at the actual allegations with respect to the breach of

18    contract claim, in paragraphs 90 through 96, the allegations

19    are not by the alleged breach by the Stanford professors in an

20    academic paper.

21         What they are alleging is that there is encouragement of

22    their customers to use their reagents with our instrument, and

23    there is simply no allegation whatsoever that any customer has

24    breached any agreement in doing so, let alone that we have

25    encouraged that.

PROCEEDINGS

```
1        So even at best, they don't plead any inducement of a

2   breach.

3        THE COURT:  All right.  Let me say it in my own words.

4   Then I want plaintiff to explain this.

5        Yes, it's apparently true that these two doctors, Bendall

6   and Angelo, wrote a paper in which it can be characterized as

7   encouraging customers, your customers, to use their fluids with

8   the -- your product.  And let's assume for the sake of argument

9   that that would, in fact, be a violation of the Ts and Cs.  But

10  what she says is that you don't allege a single customer who

11  has actually done that.

12       MR. MARSHALL:  We do allege a customer that's done

13  that, and that is Stanford University --

14       THE COURT:  Where is that?  I don't see that.

15       MR. MARSHALL:  Dr. Bendall and Angelo at Stanford

16  University.  That's referred to earlier in paragraph 64, the

17  prior page, and they admit in that paper that they used the

18  Fluidigm Maxpar X8 Antibody Labeling Kit as a critical

19  commercial assay for use with IONPath's technology.

20       That's the specific breach that we are alleging of

21  Section 3.2 of the terms and conditions.

22       THE COURT:  So, then, what contract -- where does it

23  say they violated some --

24       MR. MARSHALL:  In the very next paragraph where it

25  says, "its founders breached the Ts and Cs."
```

PROCEEDINGS

1          **THE COURT:**  Right.  I see your point.

2          **MR. MARSHALL:**  And --

3          **THE COURT:**  Wait, wait, wait.  What do you say to

4   that?  So apparently, Bendall and Angelo signed off on the Ts

5   and Cs, and they wrote a paper saying they violated it.

6       What do you say to that?

7          **MS. MEHTA:**  First of all, there is no allegation of

8   breach by them.

9       But second of all --

10         **THE COURT:**  There is.  It says -- I do see that.

11  Paragraph 72, they wrote the paper, blah-blah-blah-blah, in

12  violation of the Ts and Cs.

13         **MS. MEHTA:**  You're right, Your Honor.  I apologize for

14  that.  There is no claim of breach of contract against them.

15      More importantly, there is no allegation here, or anywhere

16  in the Complaint, that IONpath, the defendant, did anything to

17  induce any breach by anyone.

18      The fact that two academics at Stanford wrote a scientific

19  paper about an experiment they ran in their lab, and that those

20  two people happen to be associated with IONpath is not enough

21  to create any kind of plausible inference that the company was

22  encouraging any kind of breach.

23         **THE COURT:**  All right.  Maybe that's true.  But aren't

24  Bendall and Angelo the founders of IONpath?

25         **MS. MEHTA:**  They are cofounders of the company, and

**PROCEEDINGS**

1  they have varying degrees of --

2         THE COURT:  When did IONpath get formed?

3         MS. MEHTA:  IONpath was formed 2018.

4         THE COURT:  What month?

5         MS. MEHTA:  Oh, no, I'm sorry, 2014.  September of

6  2014.

7         THE COURT:  Oh, at the time IONpath -- they came on

8  board in 2014, and this paper was submitted in 2018.

9         MS. MEHTA:  Right.

10        THE COURT:  So --

11        MS. MEHTA:  But --

12        THE COURT:  -- can't we infer from that that they did

13  this on behalf of IONpath?

14        MS. MEHTA:  No, Your Honor, you can't.  And the reason

15  for that is, one, although these people have some consulting

16  role with IONpath, they also are academics that have a

17  professor position at Stanford and have researched well outside

18  of the scope of what they had to do with IONpath.  And there is

19  no allegation that what they were doing was on behalf of

20  IONpath or at the direction of IONpath.

21     And more fundamentally, the allegation of inducement here

22  is based on the paper itself.  How can the paper induce -- the

23  cell paper that is the subject of paragraph 72, be inducing

24  customers to breach when the breach that they are alleging is

25  the paper itself?  It's a completely circular argument.

1        **THE COURT:**  Oh, the paper is alleged to have admitted

2   using Fluidigm's antibody labeling kit with IONpath -- I'm

3   sorry, with -- using the two products together.

4        **MS. MEHTA:**  That's not inducement of breach of a

5   contract by a customer.  In other words, they are arguing here,

6   if you take Mr. Marshall's explanation at its face, what they

7   are arguing is that these two scientific researchers breached a

8   contract.

9        They are also arguing that the paper in which they say

10  they breached the contract is inducement of a breach of

11  contract by someone else.  In other words, Dr. Bendall and

12  Dr. Angelo can't be inducing themselves, let alone, is that

13  evidence that IONpath is doing the inducement.

14       And that's the problem, is that all of this together

15  doesn't show that the company, IONpath, induced anyone to

16  breach a contract.  At best, two people that have some role

17  with IONpath, but are not the company itself, had in their

18  academic life took actions that are alleged to breach a

19  contract.

20       That's not inducement, and it's not inducement of a breach

21  by someone other than IONpath, which is what's required.

22       **THE COURT:**  What does the -- show me where the

23  Complaint is.  I'm sorry, the claim for relief that goes to --

24       **MS. MEHTA:**  Paragraphs 90 through 96 is the

25  intentional interference count.

1        **THE COURT:**  90 through 96, intentional interference

2   with contractual relations.  We allege Fluidigm requires its

3   customers -- is IONpath a customer?

4        **MS. MEHTA:**  Of Fluidigm's?

5        **THE COURT:**  Yeah.

6        **MS. MEHTA:**  No, not that I'm aware of.  And there is

7   certainly no allegation of that.

8        **THE COURT:**  Well, let me ask plaintiff:  Does the

9   Complaint specify any customer who has breached a contract and

10  not -- let's say, other than the possibility of those two

11  professors, does the Complaint identify any other customer who

12  has breached the Ts and Cs?

13       **MR. MARSHALL:**  Other than those two professors at

14  Stanford University, there is not a specific allegation that

15  other customers breached.  But there is an allegation that a

16  class of customers were induced to breach, and did breach.

17       And I think I'm actually being held to the wrong standard

18  here, Your Honor.  If I could point you to the case law on this

19  issue, and specifically your decision on the *Swingless Golf*

20  case, that that opinion says (reading):

21            "Although the Complaint does not point to any single

22        contract, it does allege a specific class of existing

23        contracts that defendants purportedly induced the breach

24        thereof, those existing between plaintiff and its

25        customers for the Swingless Golf Club."

**PROCEEDINGS**

1     This pleading --

2              THE COURT:  That's bringing back a fond memory, that

3     case.

4              MR. MARSHALL:  Yeah, this pleading survives a motion

5     to dismiss.  That's what that opinion says.  And so --

6              THE COURT:  What do you say to that, that they have

7     alleged a class of contracts and that's good enough?

8              MS. MEHTA:  Yes, Your Honor.  The answer to that is

9     twofold:  One is, unlike in *Swingless Golf Clubs*, where there

10    was a specific and ascertainable class of contracts, the

11    allegation here is the terms and conditions which apply to any

12    of their customers.  It could be dozens or hundreds of

13    customers.  I don't know how many customers they have.  So

14    there is no way for us to know what customers they are claiming

15    we induced to breach a contract.

16        And more importantly, if you read paragraphs 90 through 96

17    carefully, which I know the Court has, there is no allegation

18    that there has actually been a breach.  There is lot of

19    suggestions of encouraging breaches, but no suggestion that any

20    customers actually breached the contract.

21        And that's the problem.

22              THE COURT:  All right.  That seems correct.  Isn't it?

23              MR. MARSHALL:  Your Honor, the class of contracts is

24    specifically referred to in paragraph 69.  It's not just any

25    sales --

**PROCEEDINGS**

1          **THE COURT:**  But you don't allege that even a single

2     one has ever been breached.

3          **MR. MARSHALL:**  We do, Your Honor.  We allege in

4     paragraph 73 that --

5          **THE COURT:**  Yeah, but that's the professors.  I'm

6     talking about, other than the professors, you don't identify

7     anybody who has ever breached.

8          **MR. MARSHALL:**  This is the -- this is the classic

9     problem where you -- we don't know all of the people who have

10    the MIBIscope, who have their instrument, that are now buying

11    our reagents and using them with their instrument in breach of

12    our terms and conditions.

13         So we would need that information in discovery.  We can't

14    be held to a pleading standard based on information that's not

15    available to us in --

16         **THE COURT:**  I usually agree, but I'm sympathetic to

17    that argument.  How are they supposed to know which customers

18    have breached until they get into your files?  Bone-crushing

19    discovery.  They get into your files and they find out

20    everybody who has bought your product.  Then they go out and

21    interview them and say, "Are you cheating on your Ts and Cs?"

22         Then somebody rolls over and says, yes, I'm sorry.  I have

23    been cheating.  So then they can allege it, but they can't yet.

24         **MS. MEHTA:**  No, Your Honor.  My response to that is,

25    that's precisely the kind of fishing expedition that --

PROCEEDINGS

```
 1          THE COURT:  It's not fishing.  That's the way
 2    discovery works.
 3          MS. MEHTA:  No, Your Honor.  The pleading standards
 4    require them to set forth a plausible inference based on facts
 5    that they have available to them that somebody has breached an
 6    agreement.
 7          They know who their customers are.  They know who they
 8    have Ts and Cs with.  They have sales teams that go out and
 9    talk to customers on a regular basis.
10          If they have some basis to believe that any customer has
11    breached an agreement, these are their contracts and their
12    customers, then they can plead the facts, and then they can
13    take discovery on whether we induced it.
14          THE COURT:  Here is the way your argument leads to
15    this scenario:  A company in your line of business could
16    announce to the world, or the sponsors, you go get somebody at
17    Stanford to do it for you, you say, look, this IONpath thing is
18    great.  You can use their fluids with it.  Now, be careful not
19    to tell anybody.  Be careful.  Do this on the sly.  But they
20    can never sue us because as long as they don't know you're
21    doing it, then they can't allege it, and they will never get
22    discovery because we've got this ironclad argument that will
23    knock the case out at the threshold.
24          MS. MEHTA:  It sounds like a great novel, Your Honor,
25    but there is no evidence that anything like that has ever
```

**PROCEEDINGS**

1    happened in real life.

2         These are two companies that operate in the same space, or

3    very overlapping spaces.  These people all talk to each other.

4    There it is allegations in the Complaint about how our people

5    consulted with them.

6         If they had some whiff that someone on our side was

7    inducing customers to breach their terms and contracts, and was

8    then telling people to cover it up, I guarantee you would have

9    seen it in the pleadings or you would have seen it in the

10   motion.

11        **THE COURT:**  But isn't it enough -- why wouldn't it be

12   enough just that they wrote the article?

13        **MS. MEHTA:**  It's not enough --

14        **THE COURT:**  Encouraging it, you can infer from that

15   that that was their intent and --

16        **MS. MEHTA:**  Because that's not a cause of action.  A

17   cause of action of, "You wrote on article in which someone

18   might then interpret that as, 'I have free clearance to breach

19   an agreement,'" is not intentional interference with breach of

20   contract.  The law requires there be a breach of a contract.

21        **THE COURT:**  All right.  I don't know the answer to

22   this.

23        At the very outset, you said you had three points.  I'm

24   going to let you make one more point on a completely different

25   issue here, and then I have got to move to the next case.

1          **MS. MEHTA:**  Yes, Your Honor.  The point on the second

2     issue is with respect to the indirect infringement and

3     willfulness claims.  There, there is a fundamental defect with

4     respect to both of those sets of claims, which is that there

5     is -- for two of the three patents, there is an admission from

6     Fluidigm that there was no pre-suit knowledge of those two

7     patents.

8          For all three patents, there is no allegation that there

9     was any knowledge of infringement prior to filing the

10     Complaint.  Without knowledge of the patents to three -- or

11     without knowledge of infringement of any of the three patents,

12     there is simply no basis to allege indirect infringement or

13     willful infringement.

14          **THE COURT:**  Okay.  What do you say to that?

15          **MR. MARSHALL:**  So, Your Honor, we specifically sent

16     them notice of one of the three patents.  That's the '104

17     patent.  And we specifically alleged in paragraph 36 notice of

18     the '386 patent.

19          The third patent -- we filed our original Complaint.  The

20     third patent issues.  And then a couple of days later, we filed

21     our First Amended Complaint to add that patent.

22          And what I would say to that -- for that one, of which it

23     would be -- I think they were tracking the issue into the

24     patent, but for that one, it would be hard to say that they had

25     knowledge of the patent, you know, any earlier than when it

**PROCEEDINGS**

1    issued, even when we filed our first Amended Complaint right

2    after.

3        There is good case law saying that post-suit activity,

4    which we have here, because they officially commercially

5    launched after we filed our First Amended Complaint, and that's

6    described in the papers, that that is -- that that can

7    constitute inducement that -- the knowledge of the patent from

8    the Complaint.  And then continuing, in fact, increasing the

9    infringing activity thereafter, the inducement thereafter, that

10    that knowledge as of the date of the Complaint is sufficient to

11    state a claim for post-suit inducement.

12        So for that third patent, that's the argument that I would

13    rely on.

14        For the other two patents, we specifically allege

15    knowledge.  And they do not dispute that they had knowledge of

16    the '104 patent.  They got the correspondence.  They

17    acknowledged it.

18        They do dispute that they had knowledge of the second

19    patent, the '386 patent.  But, of course, we're not here to

20    resolve factual disputes.  We're here to decide whether or not

21    the allegations are sufficient.  And we did allege knowledge of

22    that second patent, the '386 patent.

23        **THE COURT:**  All right.  What do you say to the

24    rebuttal?

25        **MS. MEHTA:**  Yes, Your Honor.  Let me break it down by

**PROCEEDINGS**

1   the three patents.  I think that will be more clear.

2       For the '386 patent, the allegation of knowledge is based

3   on knowledge of other patents in the same patent family.  There

4   is no allegation of knowledge of the '386 patent, or even the

5   application that led to the '386 patent itself.  Knowledge of

6   one patent in a family is not knowledge of the other patents in

7   a family, which are presumed to have different scope.

8           **THE COURT:**  That even came out later.

9           **MS. MEHTA:**  It came out later.  Many years later.

10          **THE COURT:**  How can you have -- you can't be a mind

11  reader and look into the future.

12          **MS. MEHTA:**  Precisely.

13          **THE COURT:**  Uh-huh.

14          **MS. MEHTA:**  And there was a suggestion from

15  Mr. Marshall that there was some sort of monitoring activity.

16  There is no allegation of that.

17          **THE COURT:**  Well, even if there was monitoring

18  activity, how can you be -- know about a patent until it

19  issues?

20          **MS. MEHTA:**  You --

21          **THE COURT:**  Or when did it issue, in terms of when

22  this lawsuit started?

23          **MS. MEHTA:**  I let me check on the '386 patent, Your

24  Honor.  I have to pull that up to tell you when it issued.

25      That issued on January 15th, 2019.  So about nine or ten

PROCEEDINGS

1  months before the lawsuit was filed.

2        THE COURT:  Well, then, you did have pre-suit

3  knowledge.

4        MS. MEHTA:  No, Your Honor.  Because we didn't know

5  about -- there is no allegation that we knew about the patent

6  until the Complaint was filed.  So there is no pre-suit --

7        THE COURT:  I see.

8        MS. MEHTA:  -- knowledge allegation.

9        THE COURT:  So what is the law on whether or not you

10 knew about the family, that's good enough?

11       MS. MEHTA:  Your Honor, the law on that is, it is not

12 good enough.  Because each claim or each set of patents is

13 presumed to have a different scope.  And so you can't infer

14 from one -- from the fact that you know about one patent in the

15 family that the party knows about other patents in the family,

16 especially here.

17       THE COURT:  Okay.

18       MS. MEHTA:  With respect to the '104 patent, which is

19 the --

20       THE COURT:  I saw the -- "patent pending" means

21 nothing.  "Patent pending" is just a gimmick that people put on

22 there, but it means nothing.  It has no legal effect.

23       MS. MEHTA:  I believe that's true, Your Honor.

24       THE COURT:  All right.

25       MS. MEHTA:  I don't know.  I have never litigated

**PROCEEDINGS**

1    that.

2            THE COURT:  All right.  Go ahead.

3            MS. MEHTA:  With respect to the '104 patent, which is

4    the patent that they claim they provided us pre-suit notice of,

5    it is correct that they sent us a letter, and in that letter,

6    in one sentence, they said, we want to advise you of the

7    issuance of the '104 patent.

8        However, and this is the patent where I said we had

9    knowledge of the patent, but no knowledge of infringement, no

10   allegation of infringement, no identification of any product or

11   technology that was alleged to infringe, no identification of

12   any claim.

13           THE COURT:  Well, what does the law say?  Does the law

14   say the letter has to say all those things?

15           MS. MEHTA:  It doesn't require that, per se,

16   Your Honor.  Obviously, that's a factual question.

17       But here, there is no allegation that there was any

18   knowledge of infringement.  And certainly, I think more cases

19   find that if you don't identify the claim, the product, or

20   anything, simply putting someone on notice of a patent is

21   knowledge of the patent but not enough to make out a case for

22   knowledge of infringement, which is required for intent for

23   indirect infringement.

24           THE COURT:  In other words, let's say that I'm -- let

25   me rephrase your point in my way.

**PROCEEDINGS**

1       So I'm there, busy engineer working away, and along with

2   42,008 bills that come in and a lot of other things, in comes a

3   letter from a lawyer saying -- and it says, "We want to put you

4   on notice of the '123 patent."  End of story.  Signed.

5       So I say, "Well, okay.  I guess I now know about the '123

6   patent, but I'm so go glad they didn't say that we infringed

7   it.  So I can throw this one away."  I throw it away.  Because

8   they didn't accuse me of infringement.  That's your point.

9           MS. MEHTA:  I would put it little bit differently,

10  because I would like to think that someone wouldn't be quite so

11  cavalier.  But it is true, Your Honor, that the law has to

12  create some sort of requirement for what it is that gets you to

13  the point of a claim for willful infringement.

14      And certainly, in a situation in which someone has put you

15  merely on notice of the patent, but not explained how that is

16  relevant in any way to your products, what claims are alleged

17  to be infringed --

18          THE COURT:  Were there some prior letters or something

19  that did point all that out?

20          MS. MEHTA:  No, Your Honor.  All the letters between

21  the parties predating the lawsuit were about this alleged

22  breach -- the alleged interference with contract issue, and

23  then there was one paragraph at the end of one letter that

24  said, "By the way, we have a '104 patent."  No claims, no

25  products, no further discussion of that.

**PROCEEDINGS**

1      **THE COURT:**  Well, but if all the other discussion had

2  been about the IONpath product in question, then maybe that was

3  good enough.

4      **MS. MEHTA:**  Well, but, Your Honor, it was not about

5  the product.  There was no suggestion as to any -- how any

6  claim limitation would be relevant to the product.

7      It was about the question of using the Fluidigm reagents

8  on the IONpath instrument.  That's what the correspondence was

9  about.

10     It didn't point to any suggestion of how it is that they

11 would claim that this newly-issued patent is relevant to the

12 technology of IONpath, what product, what claims, et cetera.

13     **THE COURT:**  Are both of these companies still in

14 business?

15     **MS. MEHTA:**  Yes, Your Honor.

16     **THE COURT:**  All right.  What do you say to the

17 argument?

18     **MR. MARSHALL:**  I think that's the -- sort of the key

19 question, Your Honor.  This is a competitor case.  There aren't

20 many companies that actually do mass cytometry.  It's a very

21 cutting edge new technology.

22     IONpath, which is less established in the starting up,

23 gets a letter from Fluidigm, which is the company that really

24 pioneered this technology, saying, "Not only are you

25 interfering with our customer contracts, but you should take a

**PROCEEDINGS**

1   look at this patent."

2        IONpath, at that point, is really only developing the

3   MIBIscope, the instrument which we allege to be infringing.  It

4   doesn't take a rocket scientist to put those two things

5   together.  You're in this kind of space.

6        So, you know, there was a specific discussion of the

7   MIBIscope.  It's really -- that is IONPath's -- the product

8   that they had in beta, that they have now commercially launched

9   that that is their product.

10       So, you know, did we have to connect all of the dots in

11  the letter to put them on notice that there was an infringement

12  concern?

13       No, Your Honor, I don't think so.

14       And we do specifically allege in the Complaint, and it's

15  really throughout, but paragraph 141 is just one example that

16  this was -- that IONpath knowingly and actively aided and

17  abetted the direct infringement of the '104 patent.

18            THE COURT:  Do you have a client representative here

19  today, too?

20            MR. MARSHALL:  I do not, Your Honor.

21            THE COURT:  Okay.  Well, I'm just -- I want to tell

22  you, I'm bringing it to an end, but this problem of why people

23  don't put enough into their notice letters, I'm going to give

24  you my speech on this, and then we're going to bring it to an

25  end.  And your client representative is here, so maybe they can

**PROCEEDINGS**

1  take this back.

2       So many times, I'm going to say at least 12 times over the

3  last five years, we have arguments just like this over somebody

4  got a letter, but the letter was vague.

5       And then, of course, I'm thinking, well, so much of this

6  could have been avoided if they had just put in one or two more

7  sentences.  Then it would have been much clearer.  So why

8  didn't they do that?

9       Now -- and so the point is, you know, next time, maybe

10  they should do it.

11       However, there is a reason.  And it's -- it's intentional,

12  and it's strategic.  Because if you put in a sentence that

13  says, "your product infringes," that under federal circuit law,

14  that would be enough for, in this case, IONpath, to go into

15  court and seek declaratory relief, and perhaps plant the flag

16  of venue somewhere that the patent owner doesn't like, like --

17  I don't know where, just wherever they don't like.  And to

18  start the litigation.  So the federal circuit has a law that is

19  on what exactly has to be in those letters in order to support

20  declaratory relief.

21       So the person on the Fluidigm side, knowing what the

22  federal circuit law is, stops short.  They could have easily

23  put that extra sentence in there, but then say, oh, no, take

24  that out.

25       In fact, maybe one of you two lawyers lined through that

**PROCEEDINGS**

1    very sentence in a draft, said, don't put that in there.  That

2    will bring a declaratory relief lawsuit.

3        So that is the reason this is -- this minuet of the

4    letters is guided, in part, by the federal circuit law on what

5    has to be in there in order to support declaratory relief.

6        So then what that means is, the Fluidigm -- person in the

7    Fluidigm situation always has to stop short and then send their

8    lawyer, like you are, in -- send their lawyer in and say,

9    "Well, anybody who read that letter would have known we were

10   claiming it was infringement."

11       I just want you -- I don't want you to even respond.  I

12   just want you to know I have seen enough of these patent cases

13   to see through this gimmick.  All right.  It is a gimmick.

14   It's a gimmick to avoid declaratory relief.

15           MS. MEHTA:  Your Honor, may I --

16           THE COURT:  No, I don't want to hear anything more.

17       I'll let you say one more word, and then I'm going to

18   bring it to a close.

19           MS. MEHTA:  One more word is, setting aside all of the

20   debate about whether the letter was sufficient, or all of that,

21   the fundamental point, and the problem with the willfulness

22   allegation, is that they are relying solely on the continuation

23   of conduct after the lawsuit was filed, which the law is mixed

24   across districts.  But in this district, the case law finds --

25   *Finjan versus Cisco* is an example --

**PROCEEDINGS**

1    **THE COURT:**  There is no such thing as a law by

2    district.

3        **MS. MEHTA:**  It -- I would say the weight of the

4    authority in this district is that the continuation of conduct

5    merely after the filing of a lawsuit does not rise to the kind

6    of egregious conduct tantamount to that of a pirate, that is

7    required for willful infringement.

8        Even if you were to accept all their allegations about

9    notice, which we don't agree with, merely continuing to sell

10   our product after we were sued is not sufficient for a finding

11   of willfulness, and a willfulness claim should be dismissed on

12   that independent basis.

13       **MR. MARSHALL:**  Your Honor, may I respond to that very

14   briefly?

15       **THE COURT:**  Yes, yes.

16       **MR. MARSHALL:**  There is a mix of authority on that.

17   We disagree with her position on that.  But even if one were to

18   say that the continuation of activity post-suit could not

19   constitute willfulness, what we have here is something

20   different, where they actually commercially launched their

21   product post-suit.  So this was not continuation of prior

22   activity.  This was a ratcheting up of activity.

23       In our opposition, we said that if you had any concerns

24   about this issue, that we're prepared to amend.  I included a

25   declaration with exhibits showing the post-suit activity that

**PROCEEDINGS**

1    would support a motion to amend on this point.  And we're

2    prepared to do that, if you have any concerns.

3         I don't think it's necessary.

4              **THE COURT:**  All right.  I have a different point.

5         When is the case management conference?

6              **MR. MARSHALL:**  It's today, Your Honor.

7              **THE COURT:**  Today.  All right.

8         Now, this would be a perfect case for my showdown

9    procedure.  Let me explain how that works.

10        You pick your best -- you pick one claim in your patent.

11   We will, by the end of the summer, have it completely done,

12   summary judgment at trial, it will all be done.

13        If you win, there will be an injunction against that

14   product.  But you only get one claim.

15        At the same time, the defendant gets to pick one claim

16   that is bogus -- because plaintiffs always assert bogus

17   claims -- and we'll have a trial on those two claims.  Or maybe

18   a summary -- half the time, I can resolve it on summary

19   judgment.  Half the time, I have to have a trial.  But it will

20   be over by August 31.

21        And either that product is going to be off the market,

22   because of the one that you picked, your best one, or maybe you

23   get hit with exceptional fees.  Because if it turns out, as it

24   does in a lot of these patent cases, that the plaintiff is way

25   off -- way off base, then you and your firm are going to pay a

**PROCEEDINGS**

1  lot of their fees for bringing this lawsuit.

2      This is called my show down procedure.  That's what we're

3  going to do in this case.

4           **MS. MEHTA:**  Your Honor, may I be heard?

5           **THE COURT:**  No.  No.  I'm not finished.

6           **MS. MEHTA:**  Oh, I'm sorry.

7           **THE COURT:**  This will cut through the BS.  It will get

8  right to the heart of it.  And you won't have to worry about

9  it.

10      If you're so innocent, why don't you want to have this?

11  Some of this is going to survive.  It's not going to be that

12  you can knock this case out on a motion to -- you might knock

13  out some of the claims.  They are saying your product

14  infringes.

15      All right.  Now, what's wrong with my procedure?

16      You go first.  You're the plaintiff.

17           **MR. MARSHALL:**  Well, Your Honor, to be honest, I think

18  I would want to discuss that with my client before I agree

19  to --

20           **THE COURT:**  Well, no, you don't get to discuss it.

21  All right?  If you don't have an opinion -- you should have

22  come prepared.  You know that I have this procedure.  You

23  should have already discussed it.

24      What's your view?

25           **MS. MEHTA:**  Yes, Your Honor.  We proposed something

**PROCEEDINGS**

1    very similar to that, but with one modification we would ask

2    the Court to consider.

3            **THE COURT:**  What's that?

4            **MS. MEHTA:**  Our proposal was that we actually have an

5    early summary judgment process on all three patents.

6            **THE COURT:**  No, no, no, no.  See, you're -- now,

7    you're trying to make me do so much work that I can't do it.  I

8    can't -- you know how many other patent cases I got?

9            **MS. MEHTA:**  I know, Your Honor.

10           **THE COURT:**  How many other cases I've got?

11           **MS. MEHTA:**  Could I --

12           **THE COURT:**  They are important to those people, too.

13   And now you want me to triple the amount of work that I have

14   got to do?

15       They can pick one of these -- if one of these is valid and

16   infringed, your product is going to go out the door.  It's

17   going to go off the shelf.

18           **MS. MEHTA:**  Could I make my pitch?

19       Understanding --

20           **THE COURT:**  No.  I'm not going to do three patents on

21   a hurry-up basis.

22       I will do one.  In fact, just one claim.

23           **MS. MEHTA:**  Our -- I completely understand, Your

24   Honor, and I understand how busy Your Honor is.

25       Our request was that you consider, on these three patents,

**PROCEEDINGS**

1  one issue per patent.  And actually, for two of the patents,

2  it's the same non-infringement argument.  So it would be two

3  non-infringement arguments across the three patents, which we

4  think will dispose of the case with respect to --

5          **THE COURT:**  No.  You'll pick weakest ones.

6      But he is going to pick their strongest.

7          **MS. MEHTA:**  But these are in the --

8          **THE COURT:**  You want to litigate their weakest party.

9      He's going to pick the one that's going to knock your

10  product off the shelf.

11          **MS. MEHTA:**  But, Your Honor, these are claim

12  requirements that are in the independent claims.  So if we win

13  on these two non-infringement positions, which we are confident

14  we will, then the case with respect to the patent claims will

15  be over.

16      And I wouldn't ordinarily ask, except as Mr. Marshall

17  said, my client is a startup.  So the idea that we're going to

18  have litigation and trial in June on two claims, and then

19  potentially have to litigate other claims after that, is --

20          **THE COURT:**  You've got three lawyers here.  You've got

21  three lawyers here.  This is big-time money.  I'm not -- you're

22  not persuading me that you're a startup, and you get -- these

23  people, Stanford and all that, they've got beaucoup money.

24      This is cheaper, to do it my way than, it is any way, the

25  way you're suggesting.  We're going to do my procedure, and I'm

**PROCEEDINGS**

1  going to give you a few -- I'm going to just send out the

2  order.  It's a standardized order.  I'm going to give you a

3  couple of weeks to decide which claim you want, and then we're

4  going to do expedited discovery.

5       And then by the month of June, we'll be in the middle of

6  summary judgment.  And then by the end of August, we will

7  have -- the jury will be sitting over there, and you two will

8  be arguing to the jury.  Then the other ones, we'll still get

9  around eventually to the other claims in the case.  That's the

10  way we're going to do this.

11           **MR. MARSHALL:**  Thank you, Your Honor.

12           **THE COURT:**  All right?  So we don't have to do

13  anything more today on the case management.  Thank you.

14           **MS. MEHTA:**  Thank you, Your Honor.

15               (Proceedings adjourned at 9:41 a.m.)

16                      ---o0o---

17

18

19

20

21

22

23

24

25

## CERTIFICATE OF REPORTER

I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter.

DATE:   Wednesday, February 12, 2020

_____

Ruth Levine Ekhaus, RDR, FCRR, CSR No. 12219
Official Reporter, U.S. District Court